[Crim. No. 16713. Second Dist., Div. One. Mar. 4, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
MARVIN ROBINSON, Defendant and Appellant.

**COUNSEL**

Frank G. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

LILLIE, Acting P. J.—A jury convicted defendant of burglarizing the premises of Copper Brite, Inc.; he admitted a previous felony conviction (§ 11530, Health & Saf. Code). Defendant appeals from judgment and order denying motion for new trial. The purported appeal from the order is dismissed (§ 1237, Pen. Code).

In the early morning hours of May 3, 1968, the premises of Copper Brite were entered through a broken window and an IBM typewriter, Olivetti adding machine, calculator, checkmaster checkwriter, Royal typewriter, electric cart and three credit cards were stolen.

Around 4 a.m. on May 3, Officer Curtsinger and his partner were patrolling the area when they saw two men in an alley near Copper Brite carrying something; Officer Curtsinger could not then determine what they were carrying; they stopped but he lost sight of them because of the corner of the building; his partner backed up the police vehicle and proceeded to drive down the alley putting on the bright lights, then he saw defendant carrying a typewriter and a red flashlight; after looking in their direction defendant crossed the alley into the rear yard of a two-apartment residence, set the typewriters under some steps of the stairs leading to the top apartment and started to run; he gave chase on foot and after pursuing defendant for some distance ran into the back yard of a building, pulled out his service revolver and ordered him to stop; defendant stopped and was placed under arrest. Back at the police vehicle the officer ordered him in but defendant refused; when the officer tried to force him into the vehicle defendant kicked him in the groin and a reflex action caused the officer to strike him in the forehead. The officer then returned to where he had seen defendant place the typewriter and retrieved the same, a flashlight and a pair of socks; in the area he also recovered a Paymaster checkwriter and Olivetti adding machine in an abandoned vehicle 25 feet from where he first saw defendant and a note pad defendant had thrown to the ground as he went to the police vehicle. For 30 to 45 minutes the officers searched the area but found no other suspect. Defendant was seated in the rear while being transported to the station; checking under the seat after defendant got out of the vehicle the officer found three credit cards made out to Alan Brite and Copper Brite.

Defendant testified that he had a get-together in his apartment, the parking lot of which is built into the alley, until 1:45 a.m.; he went to the store and when he returned he was told that someone had come to see him and he might still be in the parking lot in the alley; he went out and on the way took the trash; near the trash can two men ran past him, one of whom dropped a black leather billfold; he placed the billfold with the credit cards in his pocket intending to sell them; he saw the police come down the alley (previously Officer Jackson of Wilshire Division told him to move out of the Division or he would arrest him every time he saw him) and began to run; he was not carrying any machinery or typewriter and did not place anything under the stairwell; he ran for some distance "zigzagging" because he was intoxicated having had some alcoholic beverages to drink at the get-together; after he was apprehended on the way back to the alley he dropped the billfold containing the credit cards in an attempt to get rid of it but the officer saw him and picked it up; because he told the officer no one else had been with him he began to beat him with his club. Defendant denied entering Copper Brite, taking anything from the premises or stuffing the credit cards under the seat of the police vehicle.

On rebuttal Officer Curtsinger testified he did not carry a night stick or a sap; he denied beating defendant.

After the defense rested, counsel's motion to allow the jury to visit the scene of the crime to determine whether the officer could have viewed the scene as he described it was denied. Later during the trial defendant himself moved for a "new trial" on the ground the judge was prejudiced against him because he denied the previous motion to have the jury view the scene. The judge commented that the weather was "extremely inclement" and concluded "It still remains the Court's ruling that a view of the scene would serve no purpose." Appellant argues that the denial of his motion for the jury to view the scene of the crime was error because it was impossible for the police to have seen what Officer Curtsinger testified to in the alley.

 Section 1119, Penal Code, authorizes the trial court to permit the jury to view the scene of the crime. The granting or denial of a motion to view the premises rests in the sound discretion of the trial court. (*People* v. *Conway,* 207 Cal.App.2d 657, 660 [24 Cal.Rptr. 635].) The burden is upon the moving party to affirmatively show such discretion has been abused. (*People* v. *Wade,* 266 Cal.App.2d 918, 925 [72 Cal.Rptr. 538].) Appellant has failed to sustain this burden, and the record fails to support an abuse of the trial court's discretion. Contrary to appellant's contention that the motion was denied solely because of inclement weather, the judge ruled that a view of the scene would serve no purpose, and later on the motion for new trial reaffirmed that, in addition to the fact that during

the trial there occurred a "torrential rainstorm," it was his opinion that viewing the scene in the daylight hours "would have served little or no value, could not under any circumstances have recreated a scene as it unfolded upon the early morning hours. . . . There could have been no duplication."

Appellant's further claim that it was prejudicial error for the court not to instruct the jury on intoxication is also without merit. The circumstances of each case determine whether the failure to instruct constitutes prejudicial error. (*People* v. *Baker,* 42 Cal.2d 550, 576 [268 P.2d 705].) While the record shows that defendant did not request such instruction or that any requested instruction was refused, the evidence fails to justify the giving of such instruction on the court's own motion. While a trial court on its own motion must instruct the jury with respect to the effect of intoxication on a crime requiring specific intent where evidence of intoxication raises a factual issue (*People* v. *Baker,* 42 Cal.2d 550, 572-573, 576 [268 P.2d 705]; *People* v. *Arriola,* 164 Cal. App.2d 430, 434-435 [330 P.2d 683]), here the evidence of intoxication was minimal and such instruction was unnecessary. (*People* v. *Spencer,* 60 Cal.2d 64, 87 [31 Cal.Rptr. 782, 383 P.2d 134].) The mere fact a defendant may have been drinking prior to the commission of a crime does not establish intoxication or necessarily require the giving of an instruction thereon. (*People* v. *Miller,* 57 Cal.2d 821, 830-831 [22 Cal.Rptr. 465, 372 P.2d 297].) Here the sole evidence on this point is the following casual reference to intoxication by defendant on direct examination:

"A. [defendant] When I was running, I ran through, straight from the parking lot to the yard, out through the driveway on Alsace, across the street on Alsace zigzagging because I was intoxicated and come back to the other side of the street, as the officer testified, went down to an apartment driveway and went up the steps and jumped over a fence.

"Q. [defense counsel] You weren't so intoxicated you couldn't get over that fence?

"A. No, I was—the fence was on a level with the stairs, actually.

"Q. Now, you say you had a get-together at your house before that?

"A. Yes, I did.

"Q. Is there where you had some alcholic beverages to drinks?

"A. Yes, it was."

However, defendant's own detailed account of where he ran and what he did that night and the officer's description of defendant's actions demonstrate that there was no factual issue as to intoxication raised at the trial and none that would support an instruction thereon.

The public defender represented defendant; at the conclusion of the trial defendant moved to relieve him but having given no adequate reason the motion was denied. Appellant now claims that counsel's "ineptness" in failing to present a proper motion for the jury to view the scene of the crime and a proper defense of intoxication reduced his trial to a farce and sham relying on *People* v. *Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]. ■ "To justify relief on the ground that counsel was inadequate, it must appear that the trial was reduced to a farce or sham through the attorney's lack of competence, diligence, or knowledge of law. (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) ■ If a crucial defense is withdrawn from the case through the failure of counsel to investigate carefully all defenses of fact and law, the defendant has not received adequate representation. (*People* v. *Mattson,* 51 Cal.2d 777, 790-791 [336 P.2d 937].)" (*In re Beaty,* 64 Cal.2d 760, 764 [51 Cal.Rptr. 521, 414 P.2d 817].) ■ "Defendant has the burden, moreover, of establishing his allegation of inadequate representation 'not as a matter of speculation but as a demonstrable reality.' (*Adams* v. *United States* ex rel. *McCann* (1942) 317 U.S. 269, 281 [63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435]; accord. *People* v. *Robillard* (1960) *supra,* 55 Cal.2d 88, 97 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)" (*People* v. *Reeves,* 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35].)

■■ Here appellant has failed to sustain his burden, the case does not fall within the rule of *People* v. *Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487], and in the light of the record it cannot be said that the trial was reduced to a "farce or a sham." Counsel was competent and diligent throughout the trial and demonstrated adequate knowledge of the law; the record reflects neither lack of preparation nor the existence of any defense of intoxication. Defendant simply denied he entered Copper Brite or took anything therefrom; he relied on this defense which became inadequate or improper only because the jury refused to believe his story.

Examining the transcript of the trial proceedings, we find nothing inept or improper about defense counsel's motion to allow the jury to view the scene of the crime. The motion was denied because under the evidence the judge could see no value or useful purpose in transporting the jury to the scene. In the light of the testimony of both the officer and defendant we think he was correct. ■ As to a "proper" defense based upon intoxication, it is also clear from defendant's detailed testimony of where he went and what he did that his actions were not that of an intoxicated person; this is also borne out by the officer's account[1] of where and how defendant ran and his other

---

[1]"I got out of the police vehicle and chased the defendant northbound on Alsace. When he ran between 3029 Alsace and 3031 Alsace, he ran all the way across the street to the east sidewalk and proceeded northbound. I chased him approximately

activities. The evidence shows that his now articulated "defense" of intoxication, purely an afterthought, is based entirely upon only a passing mention by defendant in his testimony that he zigzagged when he ran because he was intoxicated. Why defense counsel did not develop this chance remark into a defense is rather obvious—after hearing all of the testimony and talking to his client he did not believe defendant had a good defense of intoxication, and neither did defendant for he made no further mention of it in his testimony nor did he claim such a defense either during the trial or on his motion for new trial, although he was very vocal on his own behalf.

The judgment is affirmed.

Thompson, J., and Gustafson, J., concurred.

---

three-quarters of a block, at which time he crossed back across the street going in a northwesterly direction, and eventually I went down the driveway into a subterranean garage of a multi-level apartment house at 3007 South Alsace, went through the subterranean garage up the steps on the other side, which meant the north side of the building, and jumped over the fence into the backyard of another location that is on Blackwelder. I don't recall the exact address.

"At this time I was approximately ten feet behind the defendant before he jumped over the fence. In fear that if he continued after getting over the fence, that he would escape, I pulled my service revolver, and I had a five-cell flashlight which made it easy for me to keep in contact, visual contact with the defendant. I ordered him to stop or I would shoot him. At this time the defendant stopped.

"I ordered him to climb back over the fence. He did, and I placed him under arrest for suspicion of 459."